Tierney, J.
This litigation arises for a commission allegedly due the plaintiff, a licensed real estate broker, from the defendants for the sale of a restaurant located in Beacon Street in Boston, Massachusetts.
The plaintiffs claim against the defendant Valias derives from Valias having listed the business with the plaintiff in 1983. The plaintiffs claim against the defendant Beldekas who purchased the business is based upon a written agreement.
The defendant Valias answers a general denial. He also denies that the plaintiff was the efficient cause of the sale of the business and denies that the fair and reasonable value of the alleged services provided by the plaintiff was ten percent of the purchase price of the property. As affirmative defenses, Valias lists: a failure to state a claim upon which relief could be granted; at no time did he enter into any brokerage contract with the plaintiff; that Aegean Fare, Incorporated, the owner of the property at 1952 Beacon Street, was under the jurisdiction of the U.S. Bankruptcy Court, which had to approve any sale and that no approval was ever received; the efficient cause of the sale was Dino Beldekas, the brother of defendant Beldekas; and that Valias was not the owner of said property, but that it was owned by Aegean Fare, Inc.
The defendant Beldekas’ answer denies that the plaintiff was the efficient cause of the sale, and denies that the fair and reasonable charge for any alleged service of the plaintiff was ten percent of the purchase price. Beldekas by way of affirmative defense also claims that the plaintiff is barred from recovery under the applicable Statute of Limitations, that there was no consideration to support the alleged agreement between Beldekas and the plaintiff and that Valias in any event, agreed to indemnify the buyer Beldekas from all liability for any commission claim of the plaintiff.
Beldekas also filed a Third Party Complaint in which he alleges that Valias and his brother Michael Vallas and Aegean Fare, Inc. in the agreement to sell the property at 1952 Beacon Street, agreed to indemnify Beldekas from all liability due to the claim of the plaintiff and/or Data Realty, Inc. in connection with that sale.
Valias, answering the third party complaint, admits that such an agreement indemnifying Beldekas was signed by Aegean Fare, Inc., denies it was signed by *106 either Nichols or Michael Valias individually, and, as an affirmative defense, claims that Valias was never an owner of the property at 1952 Beacon Street, but that it was owned by Aegean Fare, Inc.; that Valias did not sign a Purchase and Sale Agreement with Beldekas in an individual capacity, that the indemnification provision contained in the agreement between Aegean Fare, Inc. was obtained by fraud in that Beldekas told Valias that there was no broker involved in the sale and that if there was an obligation, which he denied, that it was one of Aegean Fare, Inc.; and that Aegean Fare, Inc. was a debtor in possession under Chapter 11 of the Bankruptcy Code, Case No. 83-013772, and that all contracts concerning Aegean Fare, Inc. had to be confirmed by the Bankruptcy Court which this alleged agreement was not.
The court found for the plaintiff in the sum of $9,000.00jointly and severally against both defendants, with a right of each against the other for one half of the amount, $4,500.00 with interest from March 4,1985. The court also found for the third party defendant Aegean Fare, Inc. in the amount of $9,000.00 with interest from April 26, 1985. *'
Only Vallas has requested a report.
At the trial there was evidence tending to show:
Plaintiff Nichols was a business broker. Defendant Vallás and his brother, Michael Valias, were the sole owners of the common stock of Aegean Fare, Inc., a Massachusetts corporation. Aegean Fare, Inc. was in 1983 through August, 1985, the owner of three restaurants featuring Greek food. The restaurant involved in this matter was located at 1952 Beacon Street, Cleveland Circle, Boston, Massachusetts.
Aegean Fare, Inc. was in chapter eleven in Bankruptcy Court for Massachusetts from October 3, 1983. Any agreements to sell its business and assets or any contract concerning its brokerage arrangements were subject to the approval of the Bankruptcy Court. In the early 1980’s the plaintiff Nichols had received a listing and data on three Aegean Fare restaurants (“the restaurants”). At some time thereafter, he learned the restaurants were in bankruptcy and that an exclusive brokerage arrangement for the sale of the restaurants had been given to a third party, Data Realty, Inc.
About June 1984, Valias, very anxious to sell the restaurants, called Nichols to get a buyer for all or any of them. The exclusive given Data Realty, Inc. had expired. There was no discussion about a commission, about the bankruptcy status of Aegean Fare, Inc. or indeed that the restaurants were owned by the corporation.
In the meantime, Beldekas had called Nichols to find out about the availability of a restaurant business. Thus, in early June, 1984, Nichols called Beldekas at home and said he, Nichols, had a couple of places to show Beldekas. Thereupon Beldekas went to Nichols’ office and they proceeded to the Aegean Fare restaurant at the Faneuil Hall Market. Before entering, Nichols gave Beldekas a one page form dated June 2,1984.Theform lists the restaurant, contains financial and lease data with respect to each (which data, if ever accurate, had become inaccurate) and among other printed language, says this: “In consideration of services rendered and confidential information given” to Beldekas by Nichols, Beldekas agrees that should he acquire any of the restaurants he would pay Nichols a ten percent commission. The following typed language was added: “The commission shall be otherwise paid by the seller.” The form, not read or discussed, was promptly signed by Beldekas and given to Nichols. A copy was returned to Beldekas.
Both parties then entered onto the premises of the Aegean Fare at Faneuil and spoke to the defendant Valias about the possible sale and purchase of one *107 of the restaurants. Nichols and Beldekas thereupon went to the Cleveland Circle restaurant where they spent about a half hour. Beldekas, with his brother Constantino then negotiated with Vallas and his brother and acquired the Cleveland Circle business from Aegean Fare, Inc. for one hundred and eighty thousand dollars. The sale was consummated in early 1985 after approval of the Bankruptcy Court which oversaw the eventual distribution of the purchase funds. Nichols learned about the transfer and brought this action.
At the close of the trial before the final argument, Valias made the following requests for findings of fact and rulings of law:
“1. On all the evidence, a finding for the defendant, Nicholas Vallas and third party defendants Michael Valias, Nicholas Vallas and Aegean Fare, Inc. is warranted.
COURT: Denied.
“2. On all the evidence, a finding for the plaintiff, Samuel Nichols, Inc. is not warranted against the defendants, Michael Valias, Nicholas Vallas and Aegean Fare, Inc.
COURT: Denied
“3. On all the evidence a finding for the third party plaintiff, Nicholas Beldekas is not warranted against the defendant Michael Valias, Nicholas Vallas and Aegean Fare, Inc.
COURT: Denied.
“4. On all the evidence, a finding is warranted that defendant, Nicholas Vallas and third party defendants, Nicholas Valias, Michael Vallas and Aegean Fare, Inc. did not sign a brokerage agreement nor was the plaintiff hired as a broker for the said sale with the plaintiff, Samuel Nichols, Inc. for the sale of the 1952 Beacon Street property.
COURT: Allowed, if I understand it properly.
“5. On all the evidence, a finding is warranted that the plaintiff,- ceased dealing as a broker for the defendant Nicholas Vallas and third party defendant Nicholas Valias, Michael Vallas and Aegean Fare, Inc. (if it ever was a broker for them) when he learned that Aegean Fare, Inc. was in Chapter 11 Bankruptcy and any further dealings with him would have to be approved by the Bankruptcy Court.
COURT: Allowed, if I understand it properly.
“6. On all the evidence, a finding is warranted that at the time of the sale of 1952 Beacon Street restaurant, the owner of the restaurant, Aegean Fare, Inc. was in Chapter 11 under the authority of the U.S. Bankruptcy Court, No. 83-10377-L.
COURT: Allowed.
“7. On all the evidence, a finding is warranted that Samuel Nichols, Inc. was not the efficient cause of the sale of 1952 Beacon Street restaurant.
COURT: Allowed, but see findings.
“8. On all the evidence, a finding is warranted that at no time did Nicholas Beldekas disclose to the defendant, Nicholas Vallas and third party defendants, Nicholas Valias, Michael Valias, or Aegean Fare, Inc. that he had agreed to pay Samuel Nichols, Inc. for services rendered in connection with the sale of the 1952 Beacon Street restaurant.
COURT: Allowed, but see findings.
“9. On all the evidence, a finding is warranted that the restaurant located at 1952 Beacon Street and sold to the defendant Beldekas was owned by Aegean Fare, Inc. and not Michael Valias or Nicholas Valléis.
COURT: Allowed.
*108 “10. On all the evidence, a finding is warranted that no approval or confirmation was given by the U.S. Bankruptcy Court of the alleged broker agreement between Aegean Fare, Inc. and Samuel Nichols, Inc.
COURT: Allowed, but see findings.
“II. On all the evidence, a finding is warranted that no authorization for the suit nor relief from the automatic stay provision of Section 362 of the Bankruptcy Code was given by the U.S. Bankruptcy Court as to Michael Valias. Bankruptcy No. 87-12064-CJK.
COURT: Allowed.
“12. On all the evidence, a finding is warranted that the indemnity provision in the Purchase & Sale Agreement for Aegean Fare, Inc. at 1952 Beacon Street, Between Aegean Fare, Inc. and Nicholas Beldekas, was procured by fraud.
COURT: Allowed, but see findings.
“13. As a matter of law, Samuel Nichols, Inc. was not the efficient cause of the sale of the Aegean Fare, Inc. property at 1952 Beacon Street.
COURT: Denied.
“14. As a matter of law, Nicholas Vallas and Michael Vallas are not individually liable for contracts made on behalf of Aegean Fare, Inc.
COURT: Allowed as a statement of law.
“15. As a matter of law, the indemnity provision in the contract for the sale of the 1952 Beacon Street restaurant which required the seller to indemnify Nicholas Beldekas for any monies it might owe to Samuel Nichols, Inc. or Data Realty, Inc. is invalid as it was procured by fraud.
COURT: Denied.
“16. As a matter of law, Nicholas Valias is not indebted to the plaintiff, in any amount whatsoever.
COURT: Denied.
“17. As a matter of law, neither Nicholas Valias, Michael Valias, nor Aegean Fare, Inc. is indebted to the third party plaintiff in any amount whatsoever.
COURT: Denied.”
The court, at the request of the defendant, Nicholas Beldekas, made the following rulings:
“1. Paragraph 13, Page 9 of an Agreement between Aegean Fare, Inc. and Nicholas Beldekas in accordance with the terms of which Nicholas Beldekas was to purchase the 1952 Beacon Street, Boston, Massachusetts, Restaurant business owned by Aegean Fare, Inc. from Aegean Fare, Inc. provides in part as follows: “The Seller herewith agrees to and does hereby indemnify the Buyer from any and all liability to the claim of Sam Nicholas and/or Data Realty as a broker in connection with this sale.”
COURT: Correctly quotes contract provision.
“2. It is a well settled principle of law that in the absence of fraud, mere ignorance of the contents of an instrument which a party voluntarily executes is not sufficient ground for setting it aside if ultimately the agreement is found to be different from what an individual supposed it to bc. Farrell v. Chandler, Gardner and Williams, Inc., 252 Mass. 341, 147 N.E. 822 (1925).
COURT: Allowed as basically correct.
“3. Proof of an individual’s signature entitles a party to the benefit of a presumption that one who signs an instrument has read and understood its contents and has assented to its terms and legal effect. Wood v. Massachusetts Mut. Accident Association, 174 Mass. 217, 54 N.E. 541 (1899).
COURT: Allowed as basically correct.
“4. A provision of any contract will also not be set aside when a person *109 capable of reading and understanding its contents signs the instrument negligently and without knowledge of its force or effect. O’Reilly's Case, 154 N.E. 851 (1927)
COURT: Allowed as basically correct.
“5. The language which appears on the last page of the Agreement in accordance with the terms of which Nicholas Beldekas agreed to purchase the Aegean Fare restaurant located at 1952 Beacon Street, Cleveland Circle, Boston, Massachusetts appears as follows:
AEGEAN FARE, INC.,
Michael Valias
Nicholas Valias
Nicholas Beldekas
COURT: Correctly quotes contract provision.
“6. The fact that Michael Vallas and Nicholas Valias signed the aforementioned Agreement with no indication following their respective signatures that they were signing their names in a representative capacity in behalf of Aegean Fare, Inc. demonstrates that their signatures were signed in an individual and not a representative capacity, consequently, Michael Vallas and Nicholas Vallas are obligated to Nicholas Beldekas in accordance with the subject indemnification agreement individual. First Safety Fund National Bank v. Janet M. Friel, 23 Mass. App. Ct. 583 (1987).
COURT: Denied. See facts found. (Ms. Friel signed a note, a negotiable instrument, twice).
“7. Except as otherwise established between the immediate parties to an agreement, an individual who signs his name to an instrument is personally obligated if the instrument names the persons designated but does not show that the representative signed in a representative capacity. M.G.L.A.C. 106, Section 3-403 (2) (b).
COURT: Allowed, but inapplicable to the facts here. “Instrument” means negotiable instrument (Section 3-102).
“8. If the Court believes the testimony of the witness, Dino Beldekas to the affect that he clearly explained to Michael Vallas and Nicholas Vallas and their attorney at their attorney’s office on the occasion when the Agreement between the parties was being negotiated that he wanted Michael Vallas and Nicholas Valias as well as Aegean Fare, Inc. to be responsible for paying Samuel Nichols any brokerage commission which might have been due and owing to Samuel Nichols as a result of the Sale, then in that event, such finding would be further evidence of the fact that Michael Vallas and Nicholas Valias signed the subject Agreement with respect to the indemnification provision contained in such Agreement in their individual capacities and not in a representative capacity, that is, in behalf of Aegean Fare, Inc.
COURT: Denied as too speculative and, in any event, inconsistent with facts *110 found.
“9. An undisclosed intention by one who signs an agreement to sign only in a representative capacity does not demonstrate that the signature of such individual was in fact signed in a representative rather than an individual capacity. Kuhms v. Coussement, 412 SO. 2d 779, 782 (ALA.CIV.APP.) (1982).
COURT: Allowed, but see facts found.
“10. If the Court finds that either of the defendants, Michael Valias or Nicholas Valias signed any other documents which have been introduced into evidence such as the bill of sale concerning the equipment which was the subject matter of the Agreement and/or the covenant not to compete and that in either case, a title indicating their particular office in Aegean Fare, Inc. appears after their names, that factor would be an indication that Michael Vallas and Nicholas Valias intended that the indemnification agreement between themselves and Nicholas Beldekas was to run against them in their individual capacities, because otherwise their title in the Corporation Aegean Fare,Inc.would have appeared directly following their names on the last page of the subject AGreement. First Safety Fund National Bank v. Friel, 23 Mass. App. Ct. 583 (1987).
COURT: Allowed, as some evidence but not conclusive evidence.
“11. The evidence does not demonstrate that there was a mutual mistake between the parties at the time the subject Agreement was negotiated and signed' at the office of counsel for Nicholas Vallas and Michael Valias in that Dino Beldekas and Nicholas Beldekas both intended that the signature of Michael Vallas and Nicholas Valias be individual signatures and not signatures in a representative capacity. Consequently, Nicholas Vallas and Michael Valias must be held to have signed the indemnification agreement individually and not in a corporate capacity.
COURT: Denied, if understood correctly.
“12. Based upon all the evidence this Court is warranted in entering a finding in favor of third party plaintiff, Nicholas Beldekas against third party defendants, Aegean Fare, Inc., Michael Vallas and Nicholas Valias in an amount equivalent to any sum which this Court finds that defendant Nicholas Beldekas is obligated to pay plaintiff Samuel Nichols, In c. with regard to a sales commission concerning the 1952 Beacon Street, Cleveland Circle, Boston, Massachusetts, Greek-style restaurant.
COURT: Allowed, but do not so find.”
The Court found the following facts:
In June, 1984 plaintiff Samuel Nichols Inc., (“Nichols”) was called by Nicholas Vallas (“Valias”) to find a purchaser for one or more of the three Aegean Fare Restaurants. At the time, the owner of those restaurants, Aegean Fare, Inc., was in Chapter 11 bankruptcy proceedings. Indeed, Nichols had obtained certain information about the restaurants some time in 1983, but was discouraged from undertaking to find a buyer at the time because he knew both that the possible sale of the Aegean Fare Restaurants were given on an exclusive brokerage basis to someone else, Data Realty, and that any sale of any Aegean Fare restaurant was subject to the approval of the corporation’s trustee in bankruptcy. In calling upon Nichols, Valias, an officer of Aegean Fare, Inc., impliedly agreed to and became obliged personally to pay Nichols a fair and reasonable fee should Nichols obtain a customer for any of the Aegean Fare establishments.
Soon after being solicited by Valias, Nichols called defendant Nicholas Beldekas (“Beldekas”) and arranged for the two of them to visit the *111 Aegean Fare establishment then in Quincy Market, Boston. Prior to. entering the premises, Nichols had Beldekas execute a form, printed in English, which purported to obligate Beldekas to pay Nichols a commission of 10% of the purchase price if Beldekas were to purchase any of the three locations listed. The obligation was said in the form to be in consideration of Nichols’ “services rendered and confidential information” given by Nichols to Beldekas. Following that apparent responsibility of the buyer to pay a commission, were the following words which were typed on the printed form. “The commission shall be otherwise paid by the seller.” No questions were asked and no explanation was offered at the time, just a minute or two before Nichols and Beldekas went onto the Aegean Fare’s Quincy Market rpemises where they met Valias.
All three of the named parties are middle-aged or older, of Greek extraction, and not wholly comfortable with English. They undertook and acted in the matters which bring them here with assumptions and an understanding, which, at least in significant part, reflected their common Greek background.
(The imperfect English of Nichols is manifest in the sentence in plaintiffs’ printed form which follows the typed sentence quoted above. “The statements (sic) contained herein are not guaranteed but were obtained from sources believed to be reliable and accurate. I/we (i.e., the buyer] will not hold the BROKER [Nichols] responsible for any misrepresentation made by the seller.”)
As noted, Beledekas and Nichols took no time to read nor discuss any part of that form. However, they understood and agreed that should Beldekas acquire one of the Aegean Fare establishments and should a reasonable commission not otherwise be paid by the seller, he, Beldekas would be responsible for paying it.
Vallas and Beldekas each has a brother who participated in the events involved here. Beldekas had gone to his brother Constantino (“Dino”) for help. Dino operates a large downtown Boston restaurant and is the godfather of one of the Valias’ children. Dino at first tried to talk his older brother out of buying a restaurant in bankruptcy but, when unsuccessful, then served as a spokesman with Valias’ attorney. Valias’ brother (“Michael”) was president and co-owner of Aegean Fare, Inc. Like Dino, of the Beldekas brothers, he was the more fluent in English of the Valias brothers. When a $180,000 sale price was agreed upon for the Aegean Fare Restaurant in Cleveland Circle, Dino had the Attorney for the Aegean Fare, Inc., include a provision in the purchase and sale agreement under which “the seller agrees to and does hereby indemnify the buyer from any and all liability to the claim of Sam Nichols and/or Data Realty as a broker in connection with this sale.” The agreement describes the seller as Aegean Fare, Inc., the operator of the restaurant, the holder of the beer and wine license involved in the transaction and the lessee of the space involved. The signature line of the agreement bears the typed name Aegean Fare, Inc. with the signatures of Vallas and Michael thereafter. No designation of an office (e.g.,president) appears following either of those signatures.
Nichol’s complaint contends that he is entitled' to the fair and reasonable charge for plaintiffs services which he puts at $18,000, The services are described in the complaint as plaintiffs being “the efficient and producing cause of the sale of’ the Aegean Fare Restaurant in Cleveland Circle. Nichol’s claim against Beldekas is based on the quoted *112 agreement form, which appears to impose a charge of 10% of the purchase price. But that form bases the charge on services and confidential data supplied. Here, the data was not only not confidential, it was stale and, at best, exaggerated (although no evidence was introduced to show any loss or damage as a consequence of those deficiencies.) Moreover, the charge sought to be assessed against the buyer, Beldekas, is further qualified by the above-quoted typed sentence added to the printed form, namely that “the commission shall be otherwise paid by the seller.”
Under all of the circumstances, I find that Nicholas Valias is personally obliged to pay the fair and reasonable value of Nichols’ services in finding Beldekas as a buyer. The value of those1 services I find to be $9,000.00 Beldekas, having committed himself as buyer is thus also responsible to pay that sum to Nichols. Thus, judgment is to enter for Nichols against Nicholas Vallas and Nicholas Beldekas, jointly and severally in the total sum of $9,000 (each with a right over against the other for one-half the amount, $4,500.)
With respect to Beldekas’ third party claim, Aegean Fare, Inc. alone became responsible to reimburse Beldekas for any sum that Beldekas was otherwise responsible for paying Nichols. The existence and terms of the Nichols’ agreement with Beldekas was never expressly mentioned to the Valias brothers and there was no acceptance of any responsibility on an individual basis by either of the Valias brothers as a consequence of its existence. Moreover, although Dino may have intended that the Valias brothers individually be responsibility over toward the payment of any sum due Nichols in connection with the transaction, the purchase and sale agreement form on which the Beldekases rely did not oblige the Valias brothers individually to bear the responsibility. The agreement was signed by each of the Valias brothers solely in a representative capacity. (Cf. First Safety Fund National Bank v. Friel, 23 Mass. App. Ct. 853 (1987) which involved a negotiable instrument and where the apparent individual had signed two times, one with and one without a designation of representative capacity.) Accordingly, judgment in the third-party action is to enter in favor of Beldekas but against Aegean Fare, Inc. only, and subject to the approval of the trustee in bankruptcy.
The defendant Nicholas Valias’ claim of report is based upon the finding of the trial judge that Valias is personally liable to the plaintiff Nichols for the brokerage commission for the sale of an Aegean Fare, Inc. restaurant to the defendant Beldekas, in that Valias, an officer of the Aegean Fare, Inc. impliedly agreed to and became obliged personally to pay Nichols a fair and reasonable fee should Nichols obtain a purchaser for any of the Aegean Fare, Inc. establishments,although'there was no written agreement between Nichols and Aegean Fare, Inc. or Nichols and Valias.
The word “implied” as found in Black’s Law Dictionary, Revised Fourth Edition p. 888 is used in law as contrasted with “express” i.e., where the intention in regard to the subject matter is not manifested by explicit and direct words, but is gathered by implication or necessary deduction from the circumstances, the general language or the conduct of the parties.
As the Appellate Courts have stated, “findings of fact of a trial justice wiE not be distrubed by the Appellate Division when such rulings are supportable on any reasonable view of the evidence with all rational inferences of which it is susceptible. Goslow v. Pittsburg Plate Glass Co., 39 Mass. App. Dec. 1 (1967); Bowers v. Hathaway, 337 Mass. 88 (1958); Battro v. Watertown Square *113 Theatre, Inc., 309 Mass. 223 (1941).
A trial judge’s findings are conclusive if there is evidence to support the same. Harding v. Studley, 294 Mass. 193, 194 (1936); Dolman v. Peterson, 297 Mass. 479, 481 (1937); Lariviere v. Lariviere, 304 Mass. 627, 630 (1939).
A review of the reported evidence, supra, would reveal that the plaintiff was a business broker; that the defendant Nicholas Vallas and his brother Michael Valias were the sole owners of the stock of the Aegean Fare, Inc. which owned the restaurants featuring Greek food; that the corporation was in bankruptcy, and any agreements to sell its business or assets or any contract, its brokerage arrangements were subject to the approval of the bankruptcy court; that the appellant Valias had called the plaintiff to obtain a buyer for any or all of them; and that there was no discussion about a commission, about the bankruptcy status of Aegean Fare, Inc., or about the restaurant being owned by the corporation. The defendant Beldekas had contacted the plaintiff about purchasing a business and entered into a written agreement. Later the two defendants Nicholas Vallas and Nicholas Beldekas entered into a written agreement for the sale of the Cleveland Circle business from Aegean Fare, Inc. to Beldekas. The sale was consummated in 1985 after approval of the bankruptcy court. See reported evidence in its entirety (supra).
The trial court, in response to the defendant, Valias’ request for rulings of law numbered 14. ruled:
“As a matter of law, Nicholas Vallas and Michael Vallas are,not individually liable for contracts made on behalf of Aegean Fare, Inc. COURT: Allowed as a statement of law.”
There was evidence to show and the court so found that the corporation was the owner of the restaurants and that the corporation was in bankruptcy and that the plaintiff Nichols knew of this.
The identity of the accepting party was a question of law under parole evidence and not an issue of fact for the trial court. Arcade Malleable Iron Co. v. Jenks, 229 Mass. 95 (1918).
After reviewing the reported evidence we find that it is insufficient to support an implied agreement to hold the defendant Valias personally responsible for a corporation debt.
The ruling complained of by the defendant Valias was prejudicial error and we reverse against plaintiff Nichols.
The defendant Beldekas did not claim a report.
Judgment for the plaintiff Nichols against defendant Valias is vacated.
New judgment to be entered for defendant Valias.